Good morning everyone. The first argued case this morning is number 2012-1141, In Re Classen Immunotherapies. Mr. Zito. Good morning, Your Honor. I'm Joseph Zito, here representing the petitioner, Dr. Classen, at Classen Immunotherapies. With me is Dr. Classen of Classen Immunotherapies. Welcome, Dr. Classen. I guess I'll begin by saying that I think this is a classic case where the examiner in the Court of Appeals has misinterpreted and misunderstood through maybe a hindsight misconception of what the prior art teaches and has then found it to be the same thing as what is claimed in the Classen patent. And by that I'm talking about the only references with us on appeal, which is the Edelson reference, which does not teach the same invention or the same kind of invention or the same kind of system as what is claimed in the Classen patent. When you say it's not the same kind of system, what is the distinction that you're relying on? The distinction is found right in the abstract of Edelson, and I know Edelson has more than that, it's abstract. But Edelson is a system to be used by a doctor, a physician, at the time that he's writing a prescription for a patient. So he has a patient in his office that may need a prescription for a medication, and that patient has certain characteristics. He's got age, race, gender, all sorts of characteristics, maybe a previous history of heart disease or whatever it is. And that physician will then look in this database, the Edelson database, and type in the drug he's going to prescribe and that patient's characteristics, and look and see if there's any adverse events that pop up that he should be aware of. The adverse event may be hair loss, for instance. And you can ask the patient right there, are you concerned about this adverse event of hair loss in people of your decision? And maybe say, okay, I'll get some other medication instead. That system relies on the fact that those adverse events are already in that system and available to the physician. The Klassen system is completely different. It's a system where you look at a database of raw data, and that's an important aspect in this case, raw data such as you may have a blood pressure, they may have an EKG that went along with it, they may have other things in their history that have come along that week, next month, next year. It's all raw data. And what the Klassen system talks about is looking for trends in that raw data that may suddenly become a new adverse event. Let's take the hair loss, okay? If someone takes the medication and loses their hair the next day, and they go to their physician and say, look, I lost my hair after I took the medication, and their physician says, that's an adverse event, puts it in the Edelson database, then it's an old adverse event, okay? If 100 people take the medication and 15 of them have a heart arrhythmia the next connected to that medication you took a month ago, no one writes it down, the patient doesn't, the doctor doesn't write it down as an adverse event. It's an unrecognized adverse event that's now in the raw data of the Klassen database. If then the database mining finds this adverse event, that is what is clearly defined in Klassen as a new adverse event. Different from Edelson. Edelson talks about a new adverse event vis-à-vis the physician who's prescribing. So if the physician knows about three adverse events but doesn't know about hair loss yet, and hair loss was identified a month ago, it's a new adverse event to the physician who's doing the prescribing, but it's old to the person who lost his hair, it's old to that person's physician, it's old to the database. So it's not a Klassen new adverse event. New means previously unidentified, previously unrecognized, previously unseen. And so there's a conflating of those terms because any database will have old data and new data in it. And just to say that Edelson has new adverse events that are newer than old adverse events doesn't make new the same thing as Klassen has written. How do we know that's true? Well, if you read the Klassen patent, the entire specification is very clear what the purpose of that patent is. But it's even more clear if you look at the claims because the claims have the commercialization of proprietary step. If the event is only new to the physician who's writing the prescription, then it can't be claimed, you can't get proprietary rights for it because some other patient already noticed his hair fell out. So you haven't noticed, you haven't discovered, you haven't done anything. So you couldn't possibly get to the last step of the claim if you interpreted the first step of the claim wrong. Am I understanding that your definition of new adverse events is that it has to be new to everyone, nobody knew it? New to everyone. Well, so claim 15, which uses this term of your patent, not Edelson, but your patent, claim 15 says a method for creating and using product data, said method comprises steps of accessing at least one adverse event data source that stores adverse event data. Well, so it seems to me that what you're claiming is accessing a source which has this data already in it, so somebody knows about it, right? Because they created that database, they put that data in there, and your system is accessing it. Hence, you're accessing something that is not the very first time anyone's ever discovered that this existed because you're accessing a database where the information is already contained. So it's not new to everyone. Excellent question. The data is there. The fact that it is data indicative of an adverse event related to a particular drug is not there. So let's go back with hair loss, it's a good example. If there are 15 people with hair loss in your database, but none of those 15 people said, oh, my hair loss is related to drug X, the data of taking drug X is in the database. The data of hair loss is in the database. That's the raw data, which is another one of the issues that are argued about. The fact that the hair loss is related to drug X isn't in the database. That's the new adverse event that's identified. So yes, you're looking at a database that has the data of the, because the data of the adverse event is there. So it's not a new, so when you say the words new adverse event have to be new to everyone, that's not true. What you're really saying is the correlation between the adverse and the event and the product is what you're claiming has to be new. The problem is your claims don't cover a new correlation. They use the word adverse event, and I don't see how you can read new adverse event as being new to everyone, because you just admitted that it's not new to everyone, it's the connection between the product and the adverse event that is new to people. So how do we reconcile that with your claim language? An event, such as hair loss, isn't an adverse event until it's correlated. I know a lot of bald men that would completely disagree with that statement. They don't care why they lost their hair, but they're not too thrilled about it. I think they absolutely considered an adverse event when the hair fell out. Yeah, and I agree. I'm talking about in the context of the patent. A new adverse event, does it mean that event is new? And there may be no such thing as a new adverse event, including hair loss. Let's assume the first person who took the drug X lost their hair but didn't write it down. Then you could never have a new adverse event because nothing would be new because it occurred but nobody knew about it. It doesn't become an adverse event for the sake of the claims or for the sake of the patent until it's recognized as an adverse event throughout the medical literature. Baldness is an event which may be adverse to the individual who doesn't have their hair, but it's not an adverse event vis-à-vis a particular drug until that correlation is made. And that's the point. Well, someone obviously would have thought that this was adverse or else it wouldn't have gotten into any medical database. Isn't that right? So something had gone wrong with the patient. And so there must also be entered into, I assume, the same database, whatever the medications were or whatever else had transpired, so that the correlation could then be made in this system. But you're telling us that without this system the correlations would not have been made or just would not have been made as effectively or efficiently or appropriately because there was too much data to work with. That's correct. Most adverse events are going to be recognized as adverse events before this system will find them, which eliminates them from the new category. That's correct. But let's take a more complicated situation. You have a hundred patients. Between them they have taken 27 different drugs. Some have taken one, some have taken 20 of them, some have taken five. Between them they have hair loss, weight gain, angina, a bunch of different 27 drugs. He doesn't know which drug gave him the hair loss. He knows hair loss is a bad thing and he knows he took 7 drugs. He doesn't know which one is correlated. One has to go through the whole hundred patients and find out if there is a correlation between hair loss and a particular drug X. So you're correct. This patient who has taken 7 drugs has hair loss, but he doesn't know why. 15 other people in the study also have hair loss and they haven't taken the same 7, they've taken different combinations of 22 drugs. And you need the database to mine that information to find out that hair loss is actually correlated with drug X. So you're correct. It probably wouldn't get in there, but that's not always true. It probably wouldn't get in there unless it's an adverse event. But other events get in there too, such as just a person's general genetic makeup will be in that database, which is adverse or not adverse. People may experience weight gain, but not even think it's an adverse event, assuming it's lifestyle. Whereas it may turn out that it's related to vaccination, which is another correlation that is not immediately recognized. So yes, the event probably wouldn't get in there unless it was adverse, but lots of events that are not considered adverse will get in there. But simply even knowing that an event is adverse doesn't mean you know it's an adverse event for a particular drug. My concern is a little bit more broad. You argue that new means that it's previously unknown to anyone, correct? In your brief you say that the term new means novel to the patent determines whether something is known to the entire medical community or not. That's in the last step of the claim, the commercialization for proprietary. There's the gaining proprietary protection for commercialization. Let's assume you use the database and you find hair loss is connected to drug X. And then you do whatever steps you need necessary to patent that. I'm going to use drug X to create hair loss, assuming that's something you'd want to do. You then will attempt to get proprietary rights, which is the step in the patent. If you obtain those proprietary rights... How does the invention know, say that there's a researcher in a research hospital in Oregon that isn't aware of this already, of that correlation? The researcher will not know that. Assuming he goes through the process and gets his patent, he will not know that because he would not have gotten his patent had he known that or the whole universe of information that's known to the medical and pharmaceutical community, right? Yet that's what you're arguing. That new means previously unknown to everyone. Correct. There's no absolute way to be absolutely certain of that. That's correct. But if one achieves all the steps, which includes getting the proprietary rights, one has achieved that satisfaction of the patent and satisfaction of the claims because you now have this patent, which is based upon the principle that it was new, novel, unknown to anyone else. That's correct. A patent can always be challenged. Do you want to save some rebuttal time, Mr. Zito? If there are no further questions, sir. Okay. You have a little bit of time left. Thank you. Mr. Kelly. Good morning, Your Honor. May it please the Court. Ultimately, Glassman's invention is data mining. He collects information about known adverse events, maybe gathered through pre-market studies or something like that, and he gets, I guess, real-time information that comes in from patients observing, I guess, their hairs falling out or something else. And then their system correlates the two together, looks for new observations that are perhaps significant enough that it can be a particular drug, and then sees that it's not listed in the known adverse event database that it has in its system, and it says, aha, I have a new adverse event. It's not determining whether this knowledge is new to the universe. It can't determine that. All Glassman's system can know is that this new adverse event is discovered, or that it's purportedly discovered, is not in its existing adverse event database. That's all it knows. And that's exactly what the Adelson reference does. And Mr. Zito just talked about a hypothetical situation where there's no way of knowing something's new until the patient reports in, and then once the patient reports something in, the system can look at those patient reports and figure out what these new adverse events are. But that's exactly what Adelson does. Page A1745 is an example of that. That's the Adelson reference at column 23, where it refers to patients reporting new problems, and the system observes these patient reports of new problems and decides when they've become significant enough to rise to the level of a new adverse event. So there really is no daylight between what they're doing and what Adelson does. And that's why the board correctly construed the term new adverse event to mean simply an event that wasn't known to the system itself. Klassen also focuses his argument on three other claim construction disputes that we've gone over fully in our brief. So unless the court has any questions about those. Does Adelson collect all information from all sources and put it all together? My perception was that the complexity and immensity of the sources of data are such that without the organization which is facilitated by some computer implemented activity, perhaps theoretically this is what an intelligent physician might find a way of doing. But without this organization and this structure and this signal, this information is not available and it would be useful to have it available. Well, my first response to that, Judge Newman, would be that both systems, Adelson and Klassen, uses computers and databases and large scale collection of data. But the court's question gets to, I think, a more fundamental point, which is that all Klassen is really doing here is automating the scientific method. He's automating what, as Your Honor just pointed out, any doctor would do. Any doctor giving drugs to a particular patient and noticing what's happening to the patient would themselves perhaps make a correlation in their own heads. But this is really a fundamental question of any computerized system. If you can achieve things that you know need to be done and could be done if you had another hundred years by hand and the computer does it in real time, is this something that our system of patents should recognize and encourage? Well, in this case, both the prior art and the claimed invention are sufficiently structural. They all have databases in there and, in fact, not only is Klassen's invention drawn to a computer, but that's what Adelson himself patented. Although the Adelson invention is much more robust than what Klassen discusses. Adelson does a lot of other things regarding prescriptions and things like that. If the court's question is going to the actual patentability of a system like this, I think I would agree that it depends on the level to which the structure of the system is incorporated into the claims. Well, then let's just assume that it's eligible for patenting and think about where these distinctions lie. We certainly don't want to discourage an important and potentially quite valuable advance that wasn't previously available and would never be available. I agree with that, Your Honor, and I think the situation here is that it was previously available. That is, Adelson's system does what Klassen's system does. Isn't Adelson limited to prescription drugs and a physician entering the data and reviewing the data perhaps before they prescribe a particular drug in order to determine if there's going to be any adverse effects known to that patient, perhaps even known to the use of that particular drug? Whereas the Klassen invention seems to me to have much broader uses. It not only does what the Adelson patent will result in, but doesn't it also provide information for drug manufacturers so that in the alerts and notices so that they can change the labels on the medications and it provides a much wider safety net, say, than Adelson does. Klassen does talk about that sort of use of his information, but so too does Adelson and I would direct the Court's attention to page A1744, which is column 21 of the Adelson patent. And this is where Adelson talks about making use of the information that his system comes up with. And towards the bottom of that column, about at line 62, it says, for example, drug efficacy data is of value to pharmaceutical companies, as is early warning data from reliable specialists regarding adverse reactions. And Adelson talks about making use of his system by selling the information that his system has derived to pharmaceutical companies, which, as I understand it, Judge Rayna, is precisely what your hypothetical was going towards. So unless there are no further questions, I will take the remainder of my time. Thank you very much. Okay, Mr. Zito, you have half a minute. Okay, a couple of short words. The automating the scientific method comment that was made goes to a 103 argument, which was not before the Court. I just want to point that out. We're here at 102. Does Adelson disclose the exact same thing as Klassen? We're not here on a 103. Is Klassen obvious over something else? Okay. The other point made by counsel was that if a patient notices their hair loss and their physician enters it into the database, it's what Adelson calls a new adverse event. Okay, new as in recent. Okay. That would not be a new adverse event as described in Klassen, as in claimed in Klassen. And there's the fundamental misunderstanding by the Patent Office when the examiner applied Adelson and when the Board accepted the application of Adelson. Okay. If a patient says, I took drug X and my hair fell out, let's write that down as an adverse event correlated between the two, and let's put it into Adelson's database, that's an old event in the Klassen system. Because that event can't be something that the researcher in the Klassen system discovered, found, identified, and can then get proprietary protection for. Okay. And that's a fundamental. It goes also to the commercialization, which was the last quote made by counsel for the Patent Office, which is the pharmaceutical company, and again we're assuming that hair loss is a good thing, the pharmaceutical company could commercialize the fact that drug X now gives you hair loss, and they can sell it for that. But that's commercialization of the underlying drug, which is devalued to the pharmaceutical company, which was a quote read by counsel for the Patent Office. That's not commercialization in Klassen's patent. Okay. In the Klassen patent, commercialization is commercialization of the proprietary information. The researcher must discover the correlation between hair loss and drug X and must get proprietary protection for that in some format, and then sell, license, or commercialize that proprietary protection, not the underlying drug. Okay. And I think the argument made points out the problem here in the misunderstanding of Klassen's system versus Edelson's system. If the Edelson system provides identical information as the Klassen system, let's say, except Edelson gives the information away, Klassen sells it, do we still have anticipation? Okay. With that scenario, yes, except that they don't have the same information. Edelson and Klassen could start with the same information. You could look at the same database, okay? Edelson waits for somebody else to say, here's an adverse event, let's throw it in there as a new event in the database. Klassen's patent regards that as old information, even though it's recent. Klassen says you have to find never before correlated adverse events and be able to get proprietary rights to those events so that you can commercialize them. So it's not, it is, the scenario works in that the database starts out the same. What you do with the database is different, and it's not different between commercializing and giving it away. It's a different way of looking at, looking for, recognizing and using adverse event information. Okay. Thank you, Mr. Dieter. Thank you, Dr. Klassen and Mr. Kelly. The case is taken under submission. Thank you.